RANDY S. GROSSMAN
Acting United States Attorney
MATTHEW BREHM
Assistant U.S. Attorney
California Bar No.: 239288
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-8983
Email:  matthew.brehm@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 20CR1842-DMS |
|---|---|
| Plaintiff, | UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S "SUPPLEMENTAL MOTION TO DISMISS INDICTMENT" |
| v. | |
| ZACHARY ALEXANDER KARAS, | **TOGETHER WITH STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES** |
| Defendant. | |
| | Date:    April 22, 2021<br>Time:   10:30 a.m. |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Randy S. Grossman, Acting United States Attorney, and Matthew Brehm, Assistant United States Attorney, and hereby files its Response in Opposition to the above-referenced motion.  This response in opposition is based upon the files and records of the case, together with the attached statement of facts and memorandum of points and authorities.

//
//
//

# I.

# INTRODUCTION

The currently filed charge against Zachary Alexander Karas (hereafter, Defendant or Karas) is based upon an Information (not an Indictment) filed on July 2, 2021, charging him with violating 28 U.S.C. § 5861, Possession of an Unregistered Destructive Device. *See* ECF 18. The charge stems from Karas' actions on May 31, 2020. While thousands of people took to the streets to exercise their First Amendment right and peacefully demonstrate after George Floyd's death, a handful of individuals left their homes and armed themselves intent on violence. Karas was one of those individuals.

That night, at approximately 2:00 a.m., Karas and his girlfriend were observed sitting on the pavement at the corner of Allison Avenue and Spring Street, in front of trolley tracks, blocking traffic as part of an ongoing protest in the area. At the time of the protest in La Mesa, several fires had been set and those fires burned real and personal property. Officers gave orders to the crowd, including Karas, to disperse for an unlawful assembly. Karas was arrested after he failed to leave his position. His girlfriend was also arrested after she tried repeatedly to force her way through a police line to get to Karas as he was being processed. Officers found a large stone in her purse, similar to stones that had been thrown at officers that night. Officers discovered that Karas possessed two glass bottles with wicks that contained gasoline (hereinafter "Molotov cocktails"), and fireworks. In a recorded post-arrest statement, Karas indicated that he had made the Molotov cocktails and brought them to the area of the police station because he intended to set fires. Karas claimed he eventually changed his mind and was not responsible for any of the fires that were set that night. *See* ECF 1 at 3.

Now Defendant has filed a motion to dismiss the information "due to selective prosecution." ECF 59. Defendant's motion should be denied. First, Defendant fails to carry his burden of proof to establish the United States' prosecutorial decisions had a discriminatory effect and were motivated by a discriminatory purpose. He offers *only* a

dated news article as evidence of his claims, and the news article undermines his claims. Second, he cannot meet his burden because there was no discriminatory effect or purpose in his prosecution. Defendant was prosecuted for reasons that were well-grounded in objective criteria.

## II.

## ARGUMENT

### A.  Defendant's Motion Fails in Every Respect, and Should Be Denied

*1. Applicable Law*

It is the responsibility of the Executive Branch to enforce the nation's laws. Courts ordinarily defer to a prosecutor's discretionary determinations because "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id.* at 464 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357 (1978)). The "presumption of regularity supports [prosecutorial] decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id.* (citations omitted).  The Supreme Court has long held that, "federal prosecutors deserve a strong presumption of honest and constitutional behavior, which cannot be overcome simply by a racial disproportion in the outcome, for disparate impact differs from discriminatory intent."  See *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979) (emphasis added); see also *United States v. Davis*, 793 F.3d 712, 720.

"Of course, a prosecutor's discretion is subject to constitutional constraints," meaning that "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong,* 517 U.S. at

464 (citations omitted). To prevail on a selective prosecution claim, a defendant must demonstrate the prosecutorial decision both "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id."* A defendant must present specific facts, not mere allegations, which establish a colorable basis for the existence of both discriminatory application of a law and discriminatory intent on the part of government actors." *United States v. Bourgeois*, 964 F.2d 935, 939 (9th Cir. 1992).

### 2. *Defendant Fails to Offer Any Real Evidence of a Discriminatory Effect or a Discriminatory Purpose*

Defendant claims he was selectively prosecuted because of his race. ECF 59 at 4. In support of his contention, Defendant relies exclusively on a Union Tribune article published on June 21, 2020, which reported that Defendant and Rudy Alvarez were the only two *protesters* facing federal charges and both were charged in the Southern District of California. *See* ECF 59 Ex. A. Case law, however, shows that this type of evidence is woefully insufficient to meet his burden. See *United States v. Turner*, 104 F.3d 1180 (9th Cir. 1997).

In *Armstrong*, a criminal case involving drug and firearm possession and drug trafficking, the court considered the defendant's challenges based on selective prosecution and found the defendant failed to produce evidence that persons of a different race, but otherwise comparable in criminal behavior, were presented to the United State Attorney for prosecution, but that prosecution was declined. *Id.* at 458; *see also United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015). The Court held that, "in order to establish entitlement to such discovery, a defendant must produce credible evidence that similarly situated defendants of other races could have been prosecuted but were not." *Armstrong*, 517 U.S. at 457.

In *Turner*, the defendants, charged with distribution of cocaine, also claimed they were prosecuted based on their race. *Turner*, 104 F.3d at 1182. But unlike Defendant, in support of their claims for discovery (not dismissal), they submitted a memorandum from

the Federal Public Defender's Office for the Central District of California stating that an inspection of closed cases of crack cocaine prosecutions defended by that office between 1991 and 1993 showed 47 African Americans, 5 Latino, and no white defendants had been charged with crack offenses. *Id.*

Defendants further supplemented the memo by reference to the evidence before the court in the *Armstrong* case, as well as newspaper articles, a National Public Radio report commenting on "the racial divide" in crack cocaine prosecutions, and by a study conducted by Richard Berk and Alec Campbell, "Preliminary Data on Race and Crack Charging Practices in Los Angeles," 6 Federal Sentencing Reporter 36–38 (July–August 1993). *Id.* The Berk–Campbell study covered data from 1988 to 1992 and showed 3% of 8,250 persons charged with the sale of crack by the Los Angeles District Attorney to be Anglo, 53% to be African American, 43% to be Latino, and 1% to be "other." *Id.* The comparable federal breakdown of 43 persons similarly charged was 0% Anglo, 83% African American, 16% Latino, and 0% Other. *Id.*

Despite this, the court held the defendants did not make a sufficient showing for their discovery requests. *Id.* at 1184. The court found that the articles and reports were merely anecdotal and hearsay. *Id.* With regard to the study, the Court noted:

> That report, based on a statistically unimpressive number of federal defendants, shows at most that the state of California did prosecute a small number of Caucasian crack cocaine sellers. Nothing in the report, however, shows whether these sellers were similarly situated to the sellers chosen for prosecution here. In particular, there is no showing at all that the crack cocaine sellers prosecuted by California were gang members who sold large quantities of crack; so the principal characteristic of the federal defendants is omitted.

*Id.* at 1185. The Court concluded that "[n]o reason was given. . . to doubt the 'background presumption' that United States Attorneys are properly discharging their duties," or "to doubt the integrity of prosecutors and investigators whose honesty, good faith, and absence of racial bias are unimpaired by anything in evidence before the court." *Id.*; *see also United States v. Arenas-Ortiz*, 339 F.3d 1066 (9th Cir. 2003)

Karas provides nothing close to the showing in *Turner*, which itself was a more limited request for discovery, and his motion should be denied on that basis alone.

Further, to the extent the Court gives credence to an unsworn and dated news article, Defendant misstates the contents and the contents undermine his case. Defendant claims as "fact" that "the only federal charges filed in California for offenses committed during the Black Lives Matter protests… have been filed in this district." Yet, the article specifically notes that charges were filed against Steven Carrillo in San Francisco for his goal of shooting a federal law enforcement officer under the cover of the protests. ECF 59 Ex. A at 2. Defendant takes no issue with Carrillo's prosecution, ignoring the striking parallels to his own conduct. As noted above, Defendant brought an incendiary device to a police station with the intention of using it in the midst of a protest.

Karas also limits his focus to federal charges brought in the four districts in California. There is no basis for this geographical distinction in the law and Karas offers no explanation for it. Given federal districts each have unique challenges and a United States Attorney's Office (USAO) can only control the charges brought in its own district, focusing on the crimes charged or not charged by each USAO intuitively makes the most sense when a defendant seeks to prove discriminatory purpose and effect. Karas has offered no evidence at the district level.

And if not by district, then looking to the government as a whole would seem to be the next best alternative. In that regard, the Union Tribune article notes that, "Around the country, federal prosecutors have filed at least 50 cases, some involving several defendants, stemming from protests turned violent, according to a search of published reports. The charges include arson, assault, rioting and some weapons charges." ECF 59 at 5. Karas, though, has ignored these cases in his motion.

In sum, Karas' news article does say even what he claims it says, would be insufficient evidence regardless, and, upon scrutiny, he has offered mere allegations.

Defendant's speculation cannot overcome the "presumption of regularity" that supports prosecutorial decisions.

### 3. Defendant's Prosecution Was Not Motivated by a Discriminatory Purpose

At the time of Defendant's crime, reducing gun violence and enforcing federal firearms laws was among the Department of Justice's (DOJ) highest priorities. To that end and among other steps taken, the Unites States Attorney's Office-Southern District of California (USAO) had revitalized its participation in the Project Safe Neighborhoods (PSN) program, beginning in March 2013. The PSN program has multiple strategies but includes targeting violent offenders for enforcement action, including individuals with violent criminal histories and individuals with dangerous weapons. *See* https://www.justice.gov/psn. The USAO's effort included the formation of a Violent Crimes and Firearms Unit, in January 2018, which later expanded into the Violent Crimes and Human Trafficking Section, in March 2019. The effort continued in 2020, with the launch of Project Guardian, a nationwide strategic plan to reduce gun violence. *See* https://www.justice.gov/usao-sdca/project-guardian. Destructive devices, along with other firearms perceived to be especially lethal, are regulated under the National Firearms Act (NFA), 26 U.S.C. §§ 5801-72, and are targeted in these efforts.

The seriousness of firearms offense was recently illustrated in the United States Sentencing Commission's June 2019 study on firearm offenders. They "generally recidivated at a higher rate, recidivated more quickly following release into the community, and continued to recidivate later in life than non-firearm offenders." https://www.ussc.gov/research/research-reports/recidivism-among-federal-firearms-offenders. Moreover, "[a] a greater percentage of firearm offenders were rearrested for serious crimes than non-firearms offenders."

As part of the effort to reduce gun violence, in coordination with our local law enforcement partners, the USAO actively considers for prosecution any individual with destructive devices as defined by the NFA, especially when possessed in dangerous

circumstances. Karas, who brought incendiary devices into the midst of a protest at a police station with the intent to use them, fell squarely into that criteria. Karas may dismiss his conduct as insignificant and unworthy of federal prosecution, but the USAO disagrees. Karas' actions were dangerous, his crime serious, and he was appropriately charged.

## III.
## CONCLUSION

For the foregoing reasons, the United States respectfully requests that Defendant's motion be denied.

DATED: April 15, 2021                    Respectfully submitted,

                                         RANDY S. GROSSMAN
                                         Acting United States Attorney

                                         /s/*Matthew Brehm*
                                         Assistant U. S. Attorneys